Exhibit 1

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
OKCOIN USA INC., and DOES 1-10

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

MICHAEL NGUYEN and NADER GEORGE, individually and on behalf of others similarly situated

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is: *(El nombre y dirección de la corte es):* Superior Court of the State of California, County of San Francisco, Civic Center Courthouse, 400 McAllister Street, San Francisco, CA 94102 | CASE NUMBER: *(Número del Caso):* **CGC-22-601712** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Elizabeth Kramer, Erickson Kramer Osborne LLP, 44 Tehama St., San Francisco, CA 94105, (415) 635-0631

| DATE: *(Fecha)* **09/13/2022** | Clerk, by *(Secretario)* **JEFFREY FLORES** | , Deputy *(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010).)*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)    ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date)*

**Page 1 of 1**

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

1  Trenton R. Kashima (SBN 291405)
2  **MILBERG COLEMAN BRYSON**
   **PHILLIPS GROSSMAN PLLC**
3  401 West C St., Suite 1760
   San Diego, CA 92101
4  Tel: (714) 651-8845
   tkashima@milberg.com
5
6  Julie C. Erickson (SBN 293111)
   Elizabeth A. Kramer (SBN 293129)
7  Kevin M. Osborne (SBN261367)
8  **ERICKSON KRAMER OSBORNE LLP**
   44 Tehama Street
9  San Francisco, CA 94105
   Tel: (415) 635-0631
10 elizabeth@eko.law
11 *Attorneys for Plaintiffs*
12 [Additional counsel listed on signature page]

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**09/09/2022**
**Clerk of the Court**
BY: JEFFREY FLORES
Deputy Clerk

13         IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
14              FOR THE COUNTY OF SAN FRANCISCO
15                         CIVIL UNLIMITED

**CGC-22-601712**

16

| | |
|---|---|
| 17 MICHAEL NGUYEN and NADER GEORGE, individually and on behalf of other similarly situated individuals, | Case No.: |
| 18 | |
| 19 Plaintiffs, | CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL |
| 20 vs. | |
| 21 OKCOIN USA INC., and DOES 1-10, | Complaint for Violations of: |
| 22 Defendants. | 1. Negligence |
| 23 | 2. Negligent Misrepresentation |
| | 3. Violation of Cal. Civ. Code §§ 1750, *et seq.* |
| 24 | 4. Violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.* |
| 25 | 5. Violation of Cal Bus. & Prof. Code §§ 17500, *et seq.* |
| 26 | |
| 27 | |

28

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1

Plaintiffs MICHAEL NGUYEN and NADER GEORGE ("Plaintiffs"), on behalf of themselves and all others similarly situated (the "Class"), bring this class action against Defendant OKCOIN USA INC. ("OKCoin") and DOES 1-10, whose identities are currently unknown to Plaintiffs, (collectively, "Defendants") for damages suffered by Plaintiffs and the Class, for injunctive relief, and for other recovery specified herein, and allege upon information and belief, except as to their own actions, the investigation of counsel, and the facts that are a matter of public record, as follows:

## I. <u>INTRODUCTION</u>

1. In the last decade, cryptocurrencies, a form of digital assets, have evolved from a curiosity into a core investment tool. At the start of 2022, the cryptocurrency market capitalization totaled over $1 trillion with more than one third of all American hedge funds invested in these assets. Approximately 60 million Americans – nearly one quarter of all adults – have owned Bitcoin or some other type of digital assets at one point in time.

2. Despite their rise into mainstream, the nature of many cryptocurrencies remains enigmatic. In 2021, CNBC reported on a survey showing one in three investors know "little to nothing" about the cryptocurrency in which they had invested. Consequently, cryptocurrencies' values are speculative and far more volatile and unpredictable than most other investment instruments.

3. To hedge against the inherent volatility of cryptocurrencies, some digital asset issuers have designed a class of cryptocurrencies called "stablecoins." Stablecoins are a distinct type of cryptocurrency whose price is "pegged" to a hard asset, such as a fiat currency (meaning government-issued currency) or commodity, at a rate of one-to-one. If a stablecoin is denominated in U.S. dollars then the price to buy or sell that stablecoin should always be about $1.00. Investors can buy stablecoins with a fiat currency or by converting a cryptocurrency, and the stablecoins operate as fiat equivalents that can be transferred between accounts or to online exchanges.

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

4.    Defendant OKCoin is a web-based cryptocurrency exchange, offering retail investors a marketplace to buy and sell cryptocurrencies of all types, including stablecoins. One way that OKCoin derives revenue is by levying fees when investors transact on its exchange.

5.    OKCoin also offers investors a way to earn interest (or "yield") on their digital assets through a program it calls "Earn." With OKCoin's Earn platform retail investors can deposit (or "stake") their cryptocurrencies into the equivalent of interest-bearing accounts that promise annual percentage yield rates sometimes hundreds of times higher than rates offered by U.S. retail banks. In exchange for offering the Earn function to retail investors, OKCoin charges a 3% fee on all yields realized by the investor.

6.    In 2020, a South Korean company called Terraform Labs began issuing tokens of a cryptocurrency it called TerraUSD (known as "UST"). TerraUSD, as the name suggests, was intended to maintain a one-to-one value with the U.S. dollar. Through a partnership with Terraform Labs, OKCoin created a market where investors could buy and sell UST and could invest UST through OKCoin's Earn function. OKCoin branded UST in its promotions as a "stablecoin" with "the stability of a fiat currency," representing to its investors that UST was essentially a digital U.S. dollar which eliminated the volatility risk inherent to more speculative cryptocurrencies.

7.    Contrary to OKCoin's characterizations of UST as a stablecoin whose value would trade in tandem with the U.S. dollar, UST was not backed by any hard collateral whatsoever. Instead, it used an algorithm and a complicated interplay with a corollary market for a second cryptocurrency to maintain a theoretical peg to the U.S. dollar. Because of UST's theoretical algorithmic peg and lack of hard assets backing its value, it was actually a highly risky asset with only a fragile thread tethering its value to the U.S. dollar.

8.    In May 2022, UST completely unraveled, losing over 90 percent of its value in a matter of days. Making matters worse, OKCoin restricted users who had invested in UST from trading the asset as it collapsed from a value of $1.00 on May 8, 2022, to $0.09 on May 16, 2022.

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Source: CoinGecko

9.     OKCoin users purchased UST on the understanding that it was a stablecoin whose value was pegged to the U.S. dollar and, unlike traditionally highly volatile cryptocurrencies, it's price would remain 'stable' throughout market conditions. Because of Defendants' misrepresentations regarding the stability and financial security of UST, users purchased UST anticipating it would remain priced at $1.00 and were economically harmed when it fell from this value. Further compounding the harm, OKCoin was completely unprepared to handle users' demands to redeem their funds from the Earn function, leaving users waiting for days for responses as they tried desperately to save what was left of their investments. Moreover, by restricting retail investors from selling their UST on the exchange, OKCoin prevented those investors from mitigating their losses as the value of their UST vanished. UST holders could only watch helplessly as their investments washed away. The extreme grief and stress caused by the UST's collapse turned to outrage when investors realized they had been deceived and abandoned by OKCoin.

## II.     FACTUAL ALLEGATIONS

### Cryptocurrencies and Stablecoins

10.     Cryptocurrencies are a type of digital asset originally intended to serve as a peer-to-peer medium of exchange that would work like an online analog to fiat currency but without the control or oversight of a centralized government authority or financial institution. A unit of

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

4

cryptocurrency is called a token or a coin. Tokens are issued or transferred using an underlying technology known as a "blockchain ledger." A blockchain ledger is a shared database stored across a network of thousands of computers that each record, verify, and broadcast "blocks" of token transactions. As payment for verifying transactions and generating blocks, the block producers are rewarded with tokens. When generated or acquired, a cryptocurrency token is stored in an owner's digital account known as a "wallet." This wallet serves much like a bank account but is maintained by the owner and not by a bank or other intermediary. The wallet's owner may store or send and receive tokens from other wallets. Thus, cryptocurrency tokens can, in theory, be used to buy and sell goods and services without the involvement of financial institutions or governments. These features led many early proponents to laud cryptocurrency as an end to banks and reliance on centrally issued and controlled fiat currencies.

11.    Cryptocurrencies have yet to deliver on the promise of eliminating the need for traditional finance because of inherent price volatility and inefficiencies as a means of exchange. Transactions involving cryptocurrency can be slow while the value of cryptocurrency coins is highly volatile – so volatile that the value of a coin is prone to change in the time it takes for a digital transaction to be completed. As a result, many cryptocurrencies are unreliable as a means of exchange or a store of value.

12.    Generally, cryptocurrencies have value because tokens are limited in amount, transferrable, and require effort to produce. To generate new tokens of most cryptocurrencies, block producers, or "miners," are required to dedicate a tremendous amount of computing resources to the endeavor, making the tokens generated both scarce and expensive. The value of cryptocurrencies relative to fiat currency is highly volatile, with many of the most traded cryptocurrencies fluctuating more than 100 percent in value in a single year. These fluctuations are enticing to investors with a stomach for high risk looking for opportunities to amass fortunes overnight. But these fluctuations also mean that risk averse investors are susceptible to sudden and dramatic losses in the value of their holdings, which they cannot readily convert to a fiat currency from their wallets.

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

13.     In 2014, in an attempt to bring stability to cryptocurrency assets and facilitate their original purpose as a means of exchange or a store of value, several companies started issuing cryptocurrency tokens they called "stablecoins," which, as the name suggests, were intended to add stability to an otherwise volatile cryptocurrency market.

14.     The value of a stablecoin is "pegged" to that of a currency and backed by national currencies, commodities, or financial instruments, differentiating this class of digital asset from other cryptocurrencies. For each stablecoin token issued, the issuer maintains a pegged value by holding an equal amount of underlying assets, such as fiat currency or a commodity, in reserve as collateral. Stated differently, stablecoins are "collateralized" because they are backed by an underlying hard asset.

15.     Like many digital assets, stablecoins seemingly have evaded any comprehensive legal framework or government oversight. In recent years, legislators have proposed new laws, administrative guidelines, and proposals for regulating these assets, but it is presently unclear whether cryptocurrencies generally, and stablecoin assets specifically, are legally regarded as commodities, currencies, or some other type of financial instrument. Instead of lumping digital assets into one general category, each subset or type of cryptocurrency must be assessed individually to determine which regulatory framework it fits best.

16.     While the legal framework within which stablecoins best fit is yet unclear, both legislators and regulators have expressed grave concerns over these digital assets. In November 2021, The President's Working Group on Financial Markets issued a report titled "Report on Stablecoins," identifying specific concerns relating to "misleading disclosures to the market" and risks associated with trading platforms. More recently, U.S. Treasury Secretary Janet Yellen cautioned in a hearing that stablecoins are a "growing product and there are rapidly growing risks." As of the filing of this complaint, proposed legislation would grant the Commodities Future Trading Commission full jurisdiction over cryptocurrency, including full regulation of stablecoins.  No agency or court of law has issued an opinion regarding the proper classification of UST or which regulatory framework has jurisdiction over it.

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

**Terraform Labs and UST**

17.     Terraform Labs created the system within which UST operated, which included UST, LUNA (its sister token), the Terra blockchain (the programmatic technology underlying both cryptocurrencies), and the Anchor Protocol (one of the mechanisms Terraform Labs purported would bring about a stable one-to-one U.S. dollar conversion rate).

18.     The Terraform white paper published by OKCoin on its website made several affirmative representations about UST, including statements that UST was: (1) "price-stable and growth-driven," (2) "achieves price-stability via an elastic money supply, enabled by stable mining incentives," and (3) "the Terra Protocol solves" problems common amongst other digital currencies.

19.     The white paper described its digital assets as a solution to market instability, which it described as follows:

> Intuitively, nobody wants to pay with a currency that has the potential to double in value in a few days, or wants to be paid in a currency if its value can significantly decline before the transaction is settled.

The white paper represented that UST would solve this issue by maintaining a stable value.

20.     The white paper also described the relationship between LUNA and UST, and the mechanisms for maintaining stability. The mechanism was based on a core agreement that one token of UST could always be exchanged (or "burned") for $1 of LUNA and $1 of LUNA could always be exchanged for 1 token of UST. If the price of UST rose to $1.01 due to increasing demand, LUNA holders were incentivized to exchange (or "burn") $1 of LUNA for one token of newly "minted" UST, which could then be sold for $1.01, thereby profiting the investor by $0.01 per token. The effect of these transactions was an increase in the total supply of UST, which would, in turn, drive the price of the UST back down to $1.00. Conversely, if the price of UST dropped to $0.99, UST holders were incentivized to exchange (or "burn") their UST at a rate of 1 UST token (worth $0.99) for $1 of LUNA, profiting them and, in turn, decreasing the supply of UST so as to drive its price back up to $1.00. The white paper assured investors that the UST's stability mechanism had "demonstrated its effectiveness in the most severe economic conditions."

21.    It was this teeter-totter of shifting incentives that was the primary mechanism for "pegging" UST to the U.S. dollar. UST was not, in any way, backed by U.S. dollars, any other traditional fiat currency, or indeed any stable underlying asset whatsoever.

**OKCoin's Definition of a "Stablecoin"**

22.    OKCoin was founded in 2013 on the wave of cryptocurrency's popularity. It offered an online marketplace – the equivalent of a stock exchange and a broker-dealer – where investors could buy and sell cryptocurrencies of all types. OKCoin described itself as "building the next generation of tools to help onboard the investors and traders who have been on the fence about crypto." These were the very same investors and traders the promise of stablecoins was intended to entice.

23.    Plaintiffs and Class Members were indeed induced by OKCoin's calling. Low fees, twenty four hour a day – seven day a week trading, and easy access made the site extremely popular. Part of the attraction of cryptocurrency markets is that, unlike traditional markets that operate on bankers' hours, digital assets can be bought, sold, or invested instantaneously at any time of day. To entice retail investors to transact on its platform, OKCoin promised consumers they could "[m]ake deposits 365 days a year 24/7 — crypto never closes."

> Crypto markets are open 24/7 and we never want you to miss an opportunity. Our goal is to make it as simple and easy as possible to buy bitcoin, buy XRP, and all of the digital assets available on the OKCoin exchange.

24.    OKCoin also represented that users of its platform could trade instantaneously because they would experience "no transaction downtime" using the platform and "fast funds," "fast gains," and would "get[] the funds you need when you need them."



Downtime is so 2020. With no transaction downtime, know your buy is always good as gold.

**Fast funds. Fast gains.**

From Apple Pay to instant deposits, you've got options for getting the funds you need, when you need them.

25.    OKCoin's efforts bore fruit and it soon billed itself as "the fastest growing global cryptocurrency exchange."

26.    OKCoin was not registered with the Financial Industry Regulatory Authority (FINRA) or the U.S. Securities and Exchange Commission (SEC) as a broker-dealer or securities exchange. It was, however, a licensed money transmitter and money services business registered with the U.S. Department of the Treasury's Financial Crimes Enforcement Network (FinCEN).

27.    When OKCoin offered trading of a cryptocurrency, it provided information and data regarding the asset, including the asset's historical pricing, circulating supply, trading activity, and market cap. It also linked to the asset's official website, white paper, and Twitter profile, where applicable. OKCoin provided this information to its retail investors and traders, and provided it to Plaintiffs and Class Members, so that they would rely on it in reaching purchase decisions, and Plaintiffs and Class Members did so reasonably rely.

28.    Stablecoins were a central component of OKCoin's strategy for growth and success. For example, stablecoins were central to OKCoin's "Earn Program," which differentiated OKCoin from many other cryptocurrency exchanges. The Earn Program offered OKCoin users a way to access a type of investing known as "DeFi," or decentralized finance. Decentralized finance allows cryptocurrency investors to lend, borrow, or invest their digital assets into algorithmic protocols, or "smart contracts," from their self-hosted wallets. OKCoin's Earn Program allowed its users access to DeFi smart contracts directly from their OKCoin account, offering new or unsavvy crypto investors a way to invest in DeFi protocols without having to self-custody their own wallets.

29.    An OKCoin customer using the Earn Program was offered a selection of third-party lending protocols, including several involving stablecoins, into which they could deposit funds and earn interest ("yield"). Yields through the Earn Program were often hundreds of times higher than those offered by typical U.S. bank deposits.

30.    In the case of UST, OKCoin customers were encouraged to purchase UST and, through the Earn Program, deposit it into UST's native smart contract, called the "Anchor" protocol, for annual percentage yields as high as 20 percent. Considering that these investors understood that

UST offered the stability and confidence of the US dollar that it was named after, the opportunity to receive 20% returns on the equivalent of a retail bank's saving account was an attractive one.

31.    The Earn Program and other stablecoin promotions proved popular with OKCoin investors. In the first quarter of 2022, stablecoin transactions accounted for over one-third of OKCoin's trading by volume.

32.    OKCoin maintained a blog that included a section called, "Crypto 101," where it offered educational resources for its users and potential investors and traders to learn about the fundamentals of cryptocurrencies. It defined stablecoins to its users on a page in its Crypto 101 blog titled, "What is a stablecoin?" The page defined stablecoins as "cryptocurrencies that are backed, or collateralized, with the value of a reserve asset." This description was without condition or caveat.



33.    OKCoin reinforced the idea that stablecoins maintained their stability through collateralization in its "TL;DR" ("too long, didn't read") "summary" of stablecoins, which claimed, "[s]tabilization comes from the backing of an underlying reserve asset."



34. OKCoin's "What are stablecoins?" and "TL;DR" definitions both represented to its retail investors and traders that stablecoins were collateralized cryptocurrencies, backed by reserve assets, leading them to believe that, if an asset was a stablecoin, it was accordingly collateralized and its value would remain pegged to the fiat currency in which it was denominated.

35. OKCoin representatives also made public statements describing the characteristics of stablecoins. In an April 2022 release, OKCoin's Chief Operating Officer publicly stated:

> While stablecoins don't offer upside appreciation, they also open up access to DeFi yield opportunities and are an ideal mix of stability and liquidity, which is especially appealing to investors today.

### OKCoin's Promotions Mischaracterized UST as a "Stablecoin"

36. OKCoin heavily promoted UST on various online forums and social platforms and on its own site.

37. In March 2022, OKCoin announced on Twitter that it would offer "#crypto rewards" to users who deposited UST in the Earn Program. Through this promotion, users who deposited a certain amount of UST into the Earn Program would receive incentive compensation.

38.    OKCoin made identical announcements, all characterizing UST as a "decentralized stablecoin," on the online forum reddit, the social networking site Facebook, the networking site LinkedIn, and the messaging platform Discord. These targeted promotional statements further claimed that UST offered investors "the benefits of #crypto with the stability of a fiat currency," indicating it was a hedge against volatility because of its supposed one-to-one peg in value to the U.S. dollar.

39.    OKCoin also held out UST as a stablecoin on its website, okcoin.com. From the OKCoin home page, users needed only click on the "Prices" tab, where they would see a listing of all OKCoin's offerings, including UST. To quickly find UST's pricing page, users could search "UST," "USTC," "Terra," or any other of several terms, and they were directed to that page. Once on the UST pricing page, users were presented with a description of UST as "the original stablecoin built on the Terra blockchain."

40.    On the UST pricing page, OKCoin also published links to the UST white paper and Terraform Labs' website. These materials further mischaracterized UST as a "stable-coin" and made fantastic claims of the Anchor Protocol's "predictable rewards in all economic conditions." OKCoin adopted Terraform Labs' statements despite having done nothing to substantiate whether the UST was capable of maintaining its promised $1.00 value or whether the Anchor Protocol was capable of delivering the promised rewards.

41.    The keystone of all OKCoin's marketing, both on its own site and elsewhere, was its claim that UST was a "stablecoin." By defining a stablecoin as collateralized without qualification, and referring to UST as a stablecoin, OKCoin was necessarily representing UST as collateralized. This was a false and misleading characterization, which misled Plaintiffs and

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Class Members into believing that UST was collateralized and inherently stable or, at a minimum, less volatile than traditional cryptocurrencies.

42.    OKCoin knew that UST was not actually backed by the U.S. dollar or any other hard asset and that a break from its peg was likely, if not certain. Yet OKCoin withheld this information from investors and waged a concerted campaign to represent the exact opposite of this fact to its retail investors, including Plaintiff.

43.    In addition to affirmatively misrepresenting UST as a stablecoin, OKCoin omitted critical and material details regarding the nature of UST. It failed to explain that the distinctive features that made UST so enticing were also what made it *not* a stablecoin. OKCoin completely omitted from its description of UST that it was uncollateralized by an underlying hard asset, which OKCoin stated elsewhere was the defining characteristic of a stablecoin. The term "uncollateralized" (or any equivalent language) appeared nowhere in OKCoin's materials describing UST. OKCoin customers would not know from reading OKCoin's representations that UST was not backed by the U.S. dollar, any other traditional fiat currency, or any stable asset whatsoever. Absent this disclosure, OKCoin never should have described UST as a stablecoin because it lacked the sole defining characteristic of a stablecoin according to OKCoin's own definition and a feature common across successful stablecoins – tangible assets held in reserve.

44.    Additionally, OKCoin omitted the fact that UST's stability and its ability to maintain a one-to-one peg to the U.S. dollar were in fact based on an unproven algorithm. While OKCoin cryptically disclosed that UST was "linked algorithmically to Terra's other original asset," it did nothing to explain what this "link" implied, what an "algorithmic stablecoin" was, or that its theoretical "algorithmic" tether and lack of collateral rendered it far riskier that a true stablecoin.

45.    OKCoin's presentation of UST was misleading to Plaintiffs and Class Members who reasonably believed that UST was properly categorized as a stablecoin and posed less risk compared to alternative digital assets available to them. These representations and omissions were material to Plaintiffs, and he would not have purchased UST if he had known that UST's

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

ability to maintain a one-to-one peg was tied to an unproven algorithm rather than tangible assets held in reserve.

46.     Cryptocurrency investors rely, in part on their exchanges, to inform them of the nature of the assets available to trade on the exchange. Other cryptocurrency exchanges marketing stablecoins offered more thorough and accurate descriptions of stablecoins to their users, including disclosures of the key differences between stablecoins and uncollateralized algorithmic assets calling themselves stablecoins (like UST).

47.     Robinhood, another cryptocurrency exchange defined stablecoins as follows:

> Stablecoins attempt to peg their price to a specific value, such as the US dollar. This is sought in two ways: 1) by tying the coins to a pool of reserve assets or 2) by algorithmically controlling the stablecoin's supply. At various points though, some stablecoins have deviated from their intended values, in some cases resulting in losses for holders. […]

> Algorithmic stablecoins have sometimes raised regulatory concerns, and in at least one instance, millions of dollars in seed money was returned to investors, among them GV and Bain Capital, when the project was cancelled.[1]

48.     The cryptocurrency exchange Kraken differentiated collateralized stablecoins and uncollateralized algorithmic assets as follows:

> Stablecoins are a type of cryptocurrency programmed to track the value of another asset like government monies or gold. Many investors are drawn to stablecoins because they offer the efficiency and transparency of cryptocurrencies, while providing relief from the sometimes extreme volatility of these assets. However, traders and investors should note that not all stablecoins are created equal.

> […]

> All stablecoins seek to mimic the price of another asset, but they don't all accomplish this in the same way. This means that some stablecoins may be riskier than others and more prone to the price fluctuations they claim to provide safety from.

> […]

> Algorithmic stablecoins are digital assets that rely on smart contracts to regulate their stability. Rather than using deposits of cryptocurrencies or issuing and redeeming debt, the software behind algorithmic stablecoins programmatically adjusts the supply of the cryptocurrency as the demand for it fluctuates. If demand

---

[1] *Available at* the Way Back Machine, https://web.archive.org/web/20211229183210/https://learn.robinhood.com/articles/1thUPqVffWfMYJvxthNrHn/what-is-a-cryptocurrency/ (last accessed June 13, 2022).

is high, the price of each stablecoin will exceed the intended peg, and the software will increase the supply. Alternatively, if demand is low, the supply will decrease.[2]

49.    Gemini, another cryptocurrency exchange, explained:

There are four primary stablecoin types, identifiable by their underlying collateral structure: fiat-backed, crypto-backed, commodity-backed, and algorithmic.

[…]

Algorithmic stablecoins do not use fiat or cryptocurrency as collateral. Instead, their price stability results from the use of specialized algorithms and smart contracts that manage the supply of tokens in circulation.[3]

50.    As a result of OKCoin's misleading promotion of the UST as a stablecoin, droves of investors purchased UST. As of May 1, 2022, it had become the world's third largest stablecoin cryptocurrency and was gaining popularity. In the first quarter of 2022, UST purchases on OKCoin increased 470 percent.

## The UST Total System Failure

51.    Because UST was not actually a stablecoin, it was always susceptible to the high risk of price volatility associated with other cryptocurrencies. That risk materialized in May of 2022.

52.    The price of UST showed signs of instability on May 7, 2022 when LUNA, the companion token that was supposed to stabilize UST's price, fell dramatically.

53.    On May 8, 2022, UST started losing value, and the mechanisms described above by which UST had maintained its peg to the dollar failed spectacularly. A true stablecoin would have maintained its peg because it could always, in theory, be exchanged one-to-one with the currency in which it was denominated. But with no collateral backing its price peg, UST had nothing to prop it up and no real value.

54.    Around the time of the initial signs of the collapse on May 8, 2022, over $2 billion USD worth of UST were "unstaked" or removed from the Anchor protocol. Next, mass quantities of UST were immediately sold and, as UST started losing its value, retail investors rushed to sell their UST to preserve what remained of their assets.

---

[2] *Available at* the Way Back Machine, https://web.archive.org/web/20210304131434/https://www.kraken.com/ learn/what-are-stablecoins/ (last accessed June 13, 2022).
[3] *Available at* the Way Back Machine, www.gemini.com/cryptopedia/what-are-stablecoins-how-do-they-work (last accessed June 13, 2022).

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

15

55.    By May 9, 2022, UST was completely unpegged from the U.S. dollar and in freefall. Within a week, the value of UST had dropped from $1.00 to $0.09 – a drop in value of over 90 percent.

56.    When UST's value fell, OKCoin's description of UST as a stablecoin, collateralized by definition, was revealed as a deception. Retail investors' savings were wiped out. Collectively, Plaintiffs and the Class Members lost millions measured in U.S. dollars.

57.    In June 2022, over a month after UST's collapse, OKCoin posted a statement on its blog titled, "What happened to LUNA?" explaining, for the first time, that UST was uncollateralized.

> There are three types of stablecoins: fiat-collateralized stablecoins, crypto-collateralized stablecoins, and non-collateralized stablecoins. Fiat-collateralized and crypto-collateralized stablecoins are backed 1:1 with the reference asset, often USD. […] Non-collateralized stablecoins, like UST, are also called algorithmic stablecoins because they typically use an algorithm or smart contract instead of collateral to manage the supply of tokens and maintain their value, or peg, to the reference asset.
>
> […]
>
> Due to the algorithmic nature of UST (and the fact that it was only partially collateralized by BTC), the panic in the market increased as many players understood that UST was only backed by LUNA and that more LUNA had to be minted to burn (decrease the supply of) UST.

58.    OKCoin profited from every sale and trade made on its platforms. It also profited from retail investors' funds staked in the Earn Program, taking a 3% fee on all yield earned. OKCoin derives its revenue from the activity of its users and profits each time they buy, sell, or stake cryptocurrencies on its platform. OKCoin is in the business of encouraging retail investors to engage in increasingly more transactions because each transaction means more revenue to the exchange. OKCoin directly promoted UST and had a vested interest in pushing the crypto asset to investors, particularly as it earned a 3% fee on UST yields its users realized. As a result, OKCoin withheld the true risks inherent to UST and misled Plaintiffs and other investors who reasonably believed that they were purchasing a reserve-backed stablecoin based on OKCoin's misrepresentations.

**OKCoin's Response Further Harmed Investors**

59.    OKCoin's actions during the UST collapse compounded its users' harm.

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

60.    At the time of the UST collapse, OKCoin's website promised investors with deposits in the Earn Program that their assets could be redeemed "anytime." According to OKCoin:

## When are deposits and redemptions processed?

Okcoin offers flexible deposit and redemption periods, so you can deposit your funds into Earn and take them out anytime you want. Okcoin adds your deposited crypto to the selected protocol everyday, and we pay out generated rewards to you daily. When you redeem, Okcoin will retrieve all assets and accumulated earnings and automatically return them to your Funding account. With fixed term offers, like STX, funds are automatically returned to your Funding account one day after the end of the term.

61.    Despite this clear promise, when Earn Program investors, including Plaintiff Nguyen, attempted to withdraw their funds, the transactions were delayed. OKCoin sent users a pop-up message stating: "your assets or crypto will be available in your trading account within 48 hours."

62.    OKCoin further imposed opaque requirements on users' ability to liquidate their holdings in UST that were never disclosed to Plaintiffs or Class Members. Unbeknownst to users, the OKCoin exchange was designed to restrict transactions of a particular digital asset and deny orders when the asset price was in high fluctuation. When UST went into freefall, the restriction was triggered and the OKCoin exchange rejected users' attempts to sell their de-pegged UST.

63.    At 12:00 p.m. Pacific Time on May 10, 2022, UST was worth approximately $0.80 USD. At 12:00 p.m. Pacific Time on May 12, 2022, 48 hours later, the value of UST had fallen to $0.15 USD.

64.    Customers demanding to withdraw their UST from the Earn Program and unsuccessfully trying to sell their UST panicked as many saw their savings evaporate. Seeking guidance and information, they reached out to OKCoin in the only way the site allowed – through chat and email (OKCoin offered no live customer service or support). OKCoin representatives took as long as three days, and likely longer in many instances, to respond. During this time, customers were left helpless as they watched money they thought was safely stored in a stablecoin disappear.

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

65.     When OKCoin representatives finally did respond to users' inquiries, they provided incomplete, often inconsistent explanations regarding why users could not promptly withdraw their UST from the Earn Program, or promptly sell the UST that was in their trading accounts. All explanations, however, stood in stark contrast to OKCoin's representations that users can take funds out of the Earn Program "anytime" they want, and users have access to and use of the digital assets in their trading accounts.

66.     Plaintiffs and Class Members incurred damages as a result of OKCoin's misrepresentations about the nature and stability of UST, its material omissions regarding UST's security and lack of collateralization, and its restrictions on users' ability to sell UST and willful delay (in stark contrast to its stated policy) in processing investors' requests to withdraw their money out of the Earn Program as the UST began to fall.

67.     As a result of OKCoin's conduct, Plaintiffs and members of the proposed Classes, defined below, have been damaged. Accordingly, Plaintiffs, individually and on behalf of all persons or entities who transacted in UST on OKCoin during the Class Period (the "Class"), bring claims for compensatory damages and other relief. Plaintiff Nguyen also brings claims individually and on behalf of a Subclass consisting of all Class Members who invested UST in the Earn Program (the "Subclass").

### III.     JURISDICTION AND VENUE

68.     This action is brought as a class action for common law negligence and negligent misrepresentations, as well as for violations of California's Consumers Legal Remedies Act ("CLRA") (Cal. Civ. Code §§ 1750, *et seq*.), the Unfair Competition Law ("UCL") (Cal. Bus. & Prof. Code §§ 17200, *et seq*.), and the False Advertising Law ("FAL") (Cal. Bus. & Prof. Code §§ 17500, *et seq*.) for monetary and equitable non-monetary relief due to Defendants' conduct.

69.     This Court has personal jurisdiction over Defendants because Defendants and their affiliates do business in the state of California and the claims asserted herein arise from conduct occurring in California.

70.     Venue is proper in this Court because, *inter alia*, Defendants engage and perform business activities in and throughout San Francisco County. By its own terms of services,

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Defendants identify San Francisco County as the venue for all legal actions against it. Many of the acts committed by Defendants complained of herein occurred in this county.

## IV.    THE PARTIES

71.    Plaintiff MICHAEL NGUYEN is and at all relevant times was a citizen of California residing in San Diego, California. Plaintiff Nguyen has been a customer of OKCoin since 2021.  In April 2022, Plaintiff Nguyen made purchases of UST on the OKCoin exchange.  At the time of purchase and until the time of the collapse, Plaintiff Nguyen's total UST holdings were worth approximately $40,100 U.S. dollars. Immediately after purchasing UST, Plaintiff Nguyen invested all of it into the OKCoin Earn Program.

72.    Plaintiff Nguyen saw and relied on OKCoin's representations regarding UST (described fully above) as a stablecoin that was pegged in value to the U.S. dollar. He also saw and relied on OKCoin's representations about being able to withdraw his assets from the Earn Program "anytime."  Plaintiff Nguyen further held the reasonable expectation that assets in his OKCoin trading account could be sold at will, without unreasonable or undisclosed restrictions imposed by OKCoin. The OKCoin website included representations like, "fast transactions…wherever you are" and "you're a click away from a brand new piece of cryptocurrency," "fast funds," "fast gains," "crypto never closes," "real-time crypto trading," "no transaction downtime," and that "Crytpo markets are open 24/7 and we never want you to miss an opportunity." But for Defendants' misrepresentations regarding UST, uninterrupted trading, and the Earn Program, Plaintiff Nguyen would not have used Defendants' products and services.

73.    As UST began to fall in value, Plaintiff Nguyen attempted to withdraw his funds from the Earn Program. However, despite OKCoin's representations that he could do so "anytime," Plaintiff Nguyen was not able to immediately withdraw his funds. Instead, when he clicked "withdraw from Earn Program" he got a pop-up message stating, "Your assets will be returned to your Portfolio within 48 hours."  Once the UST was finally returned to Plaintiff Nguyen's trading account, he attempted to sell his total UST holdings. However, when attempting the sale, Plaintiff received an automatic "cancel order" message. He contacted customer service at least three times, but OKCoin personnel could not provide an explanation for OKCoin's restriction on

the sale of UST. Instead, Plaintiff Nguyen was told to keep trying to sell the UST in different amounts, using a guess-and-check method for what amount OKCoin would allow to be sold. Finally, after several sale attempts, OKCoin permitted approximately seven separate sale transactions, and Plaintiff exhausted his UST holdings. The value of Plaintiff Nguyen's investment fell by over 90 percent. In addition to financial devastation, the loss of his investment resulted in stress, anxiety, and outrage.

74.    Plaintiff NADER GEORGE is and at all relevant times was a citizen of California residing in Carson, California. Plaintiff George has been a customer of OKCoin since early 2022.  In April 2022, Plaintiff George made purchases of UST on the OKCoin exchange.  At the time of purchase and until the time of the collapse, Plaintiff George's total UST holdings acquired through OKCoin were worth approximately $400,000 U.S. dollars. Plaintiff George saw and relied on OKCoin's representations regarding UST (described fully above) as a stablecoin that was pegged in value to the U.S. dollar. The value of Plaintiff George's investment fell by over 90 percent. In addition to financial devastation, the loss of his investment resulted in stress, anxiety, and outrage.

75.    Plaintiff George saw and relied on OKCoin's representations regarding UST (described fully above) as a stablecoin that was pegged in value to the U.S. dollar. Plaintiff George further held the reasonable expectation that assets in his OKCoin trading account could be sold at will, without unreasonable or undisclosed restrictions imposed by OKCoin. The OKCoin website included representations like, "fast transactions…wherever you are" and "you're a click away from a brand new piece of cryptocurrency," "fast funds," "fast gains," "crypto never closes," "real-time crypto trading," "no transaction downtime," and that "Crytpo markets are open 24/7 and we never want you to miss an opportunity." But for Defendants' misrepresentations regarding UST and uninterrupted trading Plaintiff George would not have used Defendants' products and services.

76.    Defendant OKCOIN USA INC. is a Delaware corporation with its principal place of business located in San Francisco, OKCoin created and operates a website from which customers

American retail investors can buy and sell digital assets – the OKCoin platform – on which UST was traded and staked.

77.    DOES 1 through 10, inclusive, are unknown to Plaintiffs who sue such Defendants by use of such fictitious names. Plaintiffs will amend this complaint to add the true names when they are ascertained. Plaintiffs are informed and believes and thereon alleges that each of the fictitiously named Defendants is legally responsible for the occurrences herein alleged, and that Plaintiffs' damages as herein alleged were proximately caused by their conduct.

78.    At all relevant times, all Defendants were and are legally responsible for all of the unlawful conduct, policies, practices, acts, and omissions as described in each and all of the foregoing paragraphs, unless otherwise indicated.

79.    At all relevant times, the unlawful conduct against Plaintiffs and Class Members as described in each and all of the foregoing paragraphs was actuated, in whole or in part, by a purpose to serve Defendants. At all relevant times, upon information and belief, the unlawful conduct described in each and all of the foregoing paragraphs was reasonably foreseeable by Defendants and committed under actual or apparent authority granted by Defendants such that all of the aforementioned unlawful conduct is legally attributable to Defendants.

80.    Plaintiffs reserve the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendants who has knowingly and willfully aided, abetted, or conspired in the false and deceptive conduct alleged herein.

## V.    CLASS ALLEGATIONS

81.    Plaintiffs bring this action to seek monetary and equitable non-monetary relief as a class action pursuant to Code of Civil Procedure section 382, on behalf of himself and the following Class:

> All persons in the United States who owned tokens of the UST stablecoin on May 9, 2022 that were purchased or acquired through OKCoin.

82.    Plaintiff Nguyen also brings this action individually and on behalf of the following Subclass:

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

All Class members who, on or after May 9, 2022, placed a redemption instruction for their UST through the Earn Program by T-Time, and the redemption was not completed at the next occurring T-Time. T-Time means the time each day that OKCoin is scheduled to redeem user's digital assets and place them in the user's OKCoin trading account.

83.    Plaintiffs reserve the right to amend the Class or Subclass definition or add further classes and subclasses if discovery or further investigation demonstrate that they should be expanded or otherwise modified.

84.    The members of the Classes are so numerous that joinder of all members would be impracticable.

85.    There are questions of law and fact common to the members of the Classes that predominate over any questions affecting only individual members, including:

   a.   Whether OKCoin owed duties to Plaintiffs and the proposed Classes;

   b.   Whether OKCoin breached those duties;

   c.   Whether OKCoin negligently misrepresented UST to Plaintiffs and the proposed Class;

   d.   Whether OKCoin negligently misrepresented the Earn Program to Plaintiff Nguyen and the proposed Subclass;

   e.   Whether OKCoin engaged in unlawful, unfair, or fraudulent business practices in connection with UST trading on the OKCoin exchange and UST investing in the OKCoin Earn Program;

   f.   Whether OKCoin's actions and omissions violate California law;

   g.   Whether OKCoin's conduct violates public policy;

   h.   Whether Plaintiffs and members of the proposed Classes are entitled to monetary damages and, if so, the nature of such relief; and

86.    Whether Plaintiffs and members of the proposed Classes are entitled to equitable, declaratory, or injunctive relief and, if so, the nature of such relief.

87.    Plaintiffs' claims are typical of the claims of the Classes. Plaintiffs have no interests antagonistic to those of the Classes and are not subject to any unique defenses.

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

88.    Plaintiffs will fairly and adequately protect the interests of the Classes and has retained attorneys experienced in class action and complex litigation.

89.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons:

    a.  It is economically impractical for members of the Classes to prosecute individual actions;

    b.  The Class and Subclass are readily ascertainable and definable;

    c.  Prosecution as a class action will eliminate the possibility of repetitious litigation.

    d.  A class action will enable claims to be handled in an orderly and expeditious manner, will save time and expense, and will ensure uniformity of decisions.

90.    Plaintiffs do not anticipate any difficulty in the management of this litigation.

## VI.    CAUSES OF ACTION

### First Cause of Action

**(On Behalf of Plaintiffs, the Class, and the Subclass)**

**Negligence**

91.    Plaintiffs incorporate the above allegations as if set forth fully herein.

92.    Defendants owed a duty to Plaintiffs and the Classes to exercise reasonable care in relation to supporting and promoting UST on the OKCoin platform, including (a) conducting due diligence on UST and its issuer; (b) taking steps to ensure that UST would remain stable and pegged to the U.S. dollar; (c) implementing processes to detect and investigate unexpected price or trading activity for  UST; and (d) ensuring the truthfulness of statements to potential investors regarding UST.

93.    The Defendants owed a duty of reasonable care toward Plaintiffs and the Classes based on Civil Code, section 1714, which requires "everyone" including Defendants, to act in a reasonable manner toward others and to be responsible for injuries caused by one's willful acts and for injuries caused by one's lack of ordinary care.

94.    Additionally, said duty was based on Defendants' special relationship to Plaintiffs and the Classes, who were Defendants' customers and who entrusted their funds to Defendants to act as custodians thereof.

95.    Additionally, said duty is based on custom and practice in the industry in which Defendants were engaged and in the course of conduct that is described herein.

96.    Additionally, said duty is based on the specific statutory duties imposed on Defendants by operation of Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Section 5 of the FTC Act, prohibits "unfair or deceptive acts or practices in or affecting commerce." This prohibition includes acts or practices that are likely to cause substantial injury to consumers, which cannot be reasonably avoided by consumers, and which are not outweighed by countervailing benefits to consumers or competition. It also includes material representations, omissions, or practices that are likely to mislead a reasonable consumer.

97.    Additionally, said duty is based on section 17200, *et seq*., of the Code of Business and Professions Code and section 1750, *et seq*. of the Civil Code, which establish a standard of care and a duty of care for Defendants, as described below.

98.    Plaintiffs and members of the Classes were within the scope of persons the above statues were intended to protect and the harm complained of herein was the type of harm against which these statutes were intended to guard.

99.    OKCoin breached its duty and violated Section 5 of the FTC Act (and similar state statutes) by failing to conduct due diligence on Terraform Labs as an issuer and UST as a stablecoin before listing it on the OKCoin exchange, failing to test UST prior to introducing it on the OKCoin exchange to ensure the asset would perform consistent with representations made by Terraform Labs and OKCoin, by listing UST on the OKCoin exchange in conjunction with making representations that it was a stablecoin and other representations as to its stability, collateralization, and one-to-one peg to the U.S. dollar despite a reasonably foreseeable risk that UST would become unpegged and cause harms and losses to Plaintiffs and the Classes, and by restricting the sale of UST on the OKCoin exchange as it collapsed despite a reasonably

foreseeable risk that Plaintiffs and the Classes would be harmed by the inability to freely sell their UST during a downturn.

100.    OKCoin further breached its duties to the Subclass by not completing redemptions of UST within the promised time period despite a reasonably foreseeable risk that Plaintiff Nguyen and Subclass Members would be harmed by the delayed withdrawal of their UST during a downturn.

101.    Defendants' violations constitute negligence *per se*.

102.    Plaintiffs and Class Members are consumers within the class of persons the laws cited above are intended to protect.

103.    Moreover, the harm that has occurred is the type of harm the laws cited above are intended to guard against.

104.    As a direct and proximate result of Defendants' negligence, Plaintiffs and members of the Classes have been damaged in an amount to be determined at trial.

## Second Cause of Action

### (On Behalf of Plaintiffs, the Class, and the Subclass)

### Negligent Misrepresentation

105.    Plaintiffs incorporate the above allegations by reference as if set forth fully herein.

106.    OKCoin represented to Plaintiffs and the Classes, through its statements and categorizations, that UST was a "reserve" backed stablecoin that was less volatile than other cryptocurrencies on the market. OKCoin also represented that the value of UST would remain pegged to the U.S. dollar at a 1-to-1 ratio, and UST constituted a safe investment with virtually no volatility. These statements were false.

107.    Defendants also omitted the fact that UST, as an uncollateralized algorithmic digital asset, had the propensity to become unpegged from the U.S. dollar and, as a result, could become worthless. In doing so, Defendants misrepresented material facts regarding UST's nature as a stablecoin (or lack thereof), purpose, value, volatility, and risk. These omissions rendered Defendants' affirmative representations deceptive and likely to mislead potential purchasers.

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

108.    Defendants failed to conduct reasonable and diligent investigation of the representations they made to Plaintiffs and the Classes to ensure that those statements were true and that there was no omission of material facts required to make the representations not misleading. Defendants, by making partial representations concerning the security and stability of stablecoins and UST, had a duty to fully disclose the risks known to them. Defendants, in the exercise of reasonable care, should have known their statements and omissions were misleading. For example, Defendants knew that it was improper to categorize UST as a stablecoin when, in reality, it did not meet OKCoin's own definition of a stablecoin and was not collateralized with tangible assets.

109.    Defendants also represented that Earn Program investors, like Plaintiff Nguyen and the Subclass, were able to withdraw their funds from Earn at "anytime." This statement was false.

110.    Defendants omitted the fact that, when attempting to withdraw their funds from the Earn Program, investors might be required to wait 48 hours before regaining control over their assets. In doing so, Defendants misrepresented material facts regarding the nature and benefits of the Earn Program. These omissions rendered Defendants' affirmative representations deceptive and likely to mislead potential purchasers.

111.    Defendants owed a duty to Plaintiffs and the Classes to speak with care and explain fully and truthfully all material facts regarding the UST and regarding the Earn Program. This duty arose from several bases, including section 5 of the FTC Act, which prohibits "deceptive acts or practices in or affecting commerce." This provision encompasses material representations, omissions, or practices that are likely to mislead a reasonable consumer.

112.    OKCoin's duty to speak with care further arose from their special relationship with Plaintiffs and members of the Classes and its unique position effectuating the sale and trade of digital assets, and serving as a custodian and bailee of digital assets. Because of its role within the cryptocurrency exchange market, OKCoin was in a superior position to protect against the harm suffered by Plaintiffs and the Classes.

113.    The above-described relationship between Defendants and Plaintiffs is such that, in morals and good conscience, Plaintiffs and the Classes had the right to rely upon Defendants for

information. Defendants were in a special position of confidence and trust with Plaintiffs and the Classes such that their reliance on Defendants' negligent misrepresentations was justified.

114.    Defendants knew, or reasonably should have known, that Plaintiffs and the Classes would rely on their misrepresentations and omissions in purchasing UST.

115.    Defendants' negligent misrepresentations and omissions regarding UST, upon which Plaintiffs and members of the Classes reasonably and justifiably relied, were intended to induce, and actually induced, Plaintiffs and Class Members to purchase UST.  Defendants' negligent misrepresentations and omissions regarding the Earn Program, upon which Plaintiff Nguyen and Subclass Members reasonably and justifiably relied, were intended to induce, and actually induced, Plaintiff Nguyen and Subclass Members to invest UST in the Earn Program.

116.    As a direct and proximate cause of their reliance on Defendants' representations, Plaintiffs and members of the Classes have been injured as described herein and are entitled to damages available by law, in an amount to be proven at trial.

### Third Cause of Action

**(On Behalf of Plaintiffs, the Class, and the Subclass)**

**Violation of the Consumers Legal Remedies Act**

(Cal. Civ. Code §§ 1750, *et seq*. ("CLRA"))

117.    Plaintiffs incorporate the above allegations by reference as if set forth fully herein.

118.    The conduct described herein took place in the state of California and constitutes unfair methods of competition or deceptive acts or practices in violation of the Consumers Legal Remedies Act ("CLRA"), Civil Code, section 1750, *et seq.*

119.    The CLRA applies to all claims of all members of the Classes because the conduct which constitutes violations of the CLRA by Defendants occurred within the state of California and because Defendants designate California law as controlling in its terms of use with all customers.

120.    Plaintiffs and members of the Class are "consumers" as defined by Civil Code, section 1761(d) because they purchased UST using OKCoin's services, and did so for personal, family, or household purposes. Plaintiff Nguyen and members of the Subclass are "consumers" as

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

defined by Civil Code, section 1761(d) because they used OKCoin's investment services to invest digital assets, and did so for personal, family, or household purposes.

121.    Defendants are "person[s]" as defined by Civil Code, section 1761(c).

122.    Plaintiffs and Class Members' purchases of UST on OKCoin's platform as well as Plaintiff Nguyen and Subclass Members' investments of UST through OKCoin's Earn Program are "transactions" as defined by Civil Code, section 1761(e).

123.    The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

124.    Defendants' false and misleading policies, acts, and practices were designed to, and did, induce Plaintiffs and Class Members to purchase and exchange UST through the OKCoin platform and were designed to, and did, induce Plaintiff Nguyen and Subclass Members to invest through the OKCoin Earn Program, and violated the following sections of the CLRA:

    a.    Section 1770(a)(5): representing that goods, property, and services have sponsorship, approval, characteristics, uses, or benefits which they do not have;

    b.    Section 1770(a)(7): representing that goods, property, and services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

    c.    Section 1770(a)(9): advertising goods, property, and services with intent not to sell them as advertised; and

    d.    Section 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

125.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Civil Code, sections 1770(a)(5)-(16) by: (1) characterizing UST as a stablecoin even though it lacks the hallmarks of a stablecoin, and OKCoin is aware of this fact; (2) representing that UST had benefits or characteristics that it did not actually have; and (3) omitting material facts about UST.

126.    Defendants also engaged in unfair competition or unfair or deceptive acts or practices in violation of Civil Code, sections 1770(a)(5)-(16) by: (1) representing that Earn investors could

redeem their assets from the Earn Program at "anytime" when, in reality, there was a significant waiting period; and (2) omitting this material fact about the Earn Program.

127.    Defendants knew, or should have known, that their representations and advertisements about the nature of UST and their promise to redeem funds invested in the Earn Program at "anytime" were false or misleading and were likely to deceive a reasonable consumer. No reasonable consumer would use Defendants' products or engage Defendants' services if they knew the UST was unstable, uncollateralized, and prone to the same volatility or if they knew Defendants would not make good on their promise to redeem funds invested in the Earn Program "anytime."

128.    Defendants generated revenue by way of service fees charged on each transaction of UST by unwary consumers through the use of false, deceptive, misleading, and unlawful advertising. By convincing users to invest UST in the Earn Program through the use of false, deceptive, misleading, and unlawful advertising, Defendants generated further revenue by way of additional service fees charged as a percent of any yield generated through the Earn Program. Defendants' products and services were of lesser quality and value than Defendants advertised in that UST was not collateralized by a hard asset to ensure a stable price but instead by an unreliable algorithm and that Defendants would not make good on their promise to redeem funds invested in the Earn Program "anytime." In reliance on Defendants' misrepresentations about its products and services, Plaintiffs and the Class made purchases of UST on the OKCoin platform that they would not have made but for Defendants' representations. Also in reliance on Defendants' misrepresentations about its products and services, Plaintiffs and the Subclass made investments of UST in the Earn Program that they would not have made, or would have paid less for, but for Defendants' representations.

129.    As a direct and proximate consequence of the actions as identified above, Plaintiffs, the Class, and the Subclass suffered injury in fact, harms, and losses including but not limited to economic loss, lost time, anxiety, panic, and physical and mental distress.

130.    Defendants' wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

131.    Defendants' conduct described herein was malicious, fraudulent, and wanton in that Defendants intentionally and knowingly provided misleading information to Plaintiffs and the Classes.

132.    Pursuant to Civil Code, section 1780, Plaintiffs and the Classes seek injunctive relief, reasonable attorney fees and costs, and any other relief that the Court deems proper.

133.    Pursuant to the provisions of Civil Code, section 1782(a), Plaintiffs provided a letter to Defendants concurrently with the filing of this Class Action Complaint notice of its alleged violations of the CLRA, demanding that Defendants correct such violations, and providing them with the opportunity to correct their business practices. If Defendants do not thereafter correct their business practices and offer appropriate relief to Plaintiffs and the Classes within thirty days of receipt, Plaintiffs will amend (or seek leave to amend) the complaint to add claims for monetary relief, including restitution and actual damages under the Consumers Legal Remedies Act.

134.    Pursuant to California Civil Code section 1780(d), attached hereto as Exhibit 1 is a declaration on behalf of Plaintiff Nguyen showing that this action has been commenced in the proper forum.

135.    Pursuant to California Civil Code section 1780(d), attached hereto as Exhibit 2 is a declaration on behalf of Plaintiff George showing that this action has been commenced in the proper forum.

**Fourth Cause of Action**

**(On Behalf of Plaintiffs, the Class, and the Subclass)**

**Violation of the Unfair Competition Law**

(Cal. Bus. & Prof. Code §§ 17200, *et seq*. ("UCL"))

136.    Plaintiffs incorporate the above allegations by reference as if set forth fully herein.

137.    The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." (Bus. & Prof. Code §§ 17200, *et seq*.)

138.    The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants as alleged herein constitute business acts and practices.

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

139.    **Unlawful**: The acts alleged herein are "unlawful" under the UCL in that they violate at least the following laws:

    a.  Civil Code §§ 1750, *et seq.*;

    b.  Bus. & Prof. Code §§ 17500, *et seq.*;

    c.  Section 1714 of the Civil Code; and

    d.  Section 5 of the FTC Act.

140.    **Unfair**: Defendants' conduct with respect to the labeling, advertising, and sale of UST and its Earn Program was and is "unfair" because Defendants' conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of their conduct, if any, does not outweigh the gravity of the harm to their victims.

141.    Defendants' conduct with respect to the labeling, advertising, and sale of UST and its Earn Program was and is also unfair because it violates public policy as declared by specific constitutional, statutory or regulatory provisions, including but not limited to Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45.

142.    Defendants' conduct with respect to the labeling, advertising, and sale of UST and its Earn Program was and is unfair because the consumer injury was substantial, not outweighed by benefits to consumers or competition, and not one consumer themselves could reasonably have avoided.

143.    **Fraudulent**: A statement or practice is "fraudulent" under the UCL if it is likely to mislead or deceive the public, applying an objective reasonable consumer test.

144.    As set forth herein, Defendants' representations regarding the nature and stability of UST were false or misleading and were likely to deceive a reasonable consumer.

145.    As set forth herein, Defendants' representations that investors could redeem funds invested in the Earn Program at "anytime" were false or misleading and were likely to deceive a reasonable consumer.

146.    Defendants knew, or should have known, that their representations and advertisements about the nature and stability of UST were false or misleading and were likely to deceive a reasonable consumer. No reasonable consumer would use Defendants' products or engage

1    Defendants' services if they knew the UST was unstable, uncollateralized, and prone to

2    volatility.

3    147.    Defendants knew, or should have known, that their representations and advertisements

4    the investors could redeem funds invested in the Earn Program at "anytime" were false or

5    misleading and were likely to deceive a reasonable consumer. No reasonable consumer would

6    use Defendants' products or engage Defendants' services if they knew Defendants would not

7    make good on their promise to allow investors to redeem funds invested in the Earn Program

8    "anytime."

9    148.    Defendants generated revenue by way of service fees charged on each transaction of UST

10   by unwary consumers through the use of false, deceptive, misleading, and unlawful advertising.

11   By convincing users to invest UST in the Earn Program through the use of false, deceptive,

12   misleading, and unlawful advertising, Defendants generated further revenue from service fees

13   charged as a percent of any yield generated through the Earn Program.

14   149.    Defendants' products and services were of lesser quality and value than Defendants

15   advertised because (a) UST was not collateralized by a hard asset to ensure a stable price but

16   instead by an unreliable algorithm; and (b) Defendants would not make good on their promise to

17   complete redemptions from Earn Program "anytime" investors request, and instead redemptions

18   were substantially delayed.

19   150.    Plaintiffs read and relied on Defendants' statements regarding its products and services as

20   described above. In reliance on Defendants' misrepresentations about its products and services,

21   Plaintiffs and the Class made purchases of UST on the OKCoin platform that they would not

22   have made but for Defendants' representations. Also in reliance on Defendants'

23   misrepresentations about its products and services, Plaintiff Nguyen and the Subclass made

24   investments of UST in the Earn Program that they would not have made, or would have paid

25   less, but for Defendants' representations.

26   151.    As a direct and proximate consequence of the actions as identified above, Plaintiff, the

27   Class, and the Subclass suffered injury in fact, harms, and losses including but not limited to

28   economic loss, lost time, anxiety, panic, and physical and mental distress. Defendants' conduct

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

continues to cause substantial injury to Plaintiffs and the other Class Members because they are unable to rely on Defendants continued misleading characterizations of stablecoins, including UST. Plaintiffs have suffered injury in fact as a result of Defendants' unlawful conduct.

152.    In accordance with Business & Professions Code, section 17203, Plaintiffs seek an order enjoining Defendants from continuing to conduct business through unlawful, unfair, and fraudulent acts and practices, and to commence a corrective advertising campaign explaining the critical distinctions between collateralized stablecoins and uncollateralized algorithmic digital assets like UST, which is custom and practice in the cryptocurrency exchange industry, as well as the true waiting period imposed when seeking to withdraw funds from the Earn Program.

153.    Plaintiffs and the Classes also seek an order for and restitution of all monies unlawfully obtained from them as a result of Defendants' violations of the UCL and any other relief allowed under the UCL, including injunctive relief, pre and post-judgment interest, costs, attorneys' fees pursuant to, *inter alia*, Code of Civil Procedure, section 1021.5, and any other relief as this Court may deem just and proper.

### Fifth Cause of Action

**(On Behalf of Plaintiffs, the Class, and the Subclass)**

**Violation of the False Advertising Law**

(Cal. Bus. & Prof. Code §§ 17500, *et seq*. ("FAL"))

154.    Plaintiffs incorporate the above allegations by reference as if set forth fully herein.

155.    The conduct described herein took place within the state of California and constitutes deceptive or false advertising in violation of Business and Professions Code, section 17500, *et seq*.

156.    Business and Professions Code, section 17500, *et seq*. prohibits deceptive or misleading practices in connection with advertising or representations made for the purpose of inducing, or which are likely to induce, consumers to purchase products.

157.    It is also unlawful under the FAL to disseminate statements concerning property or services that are "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id.*

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

158.    Defendants violated the FAL when they marketed, advertised, and promoted exchange services in connection with UST by: (1) misleading Plaintiffs and members of the Classes about the benefits of UST, (2) omitting material facts about the volatility and risks of UST, and (3) mischaracterizing UST as a stablecoin when it lacks the qualities and benefits of a stablecoin. Defendants also violated the FAL by: (1) representing that Earn investors could redeem their assets from the Earn Program at "anytime" when, in reality, there was a significant waiting period; and (2) omitting this material fact about the Earn Program.

159.    At the time of their misrepresentations and omissions, Defendants were either aware of the risks of mischaracterizing UST as a stablecoin or they were aware that they lacked the information and knowledge required to truthfully make this representation. Defendants were further aware of the risks of falsely promising that they would redeem funds invested in the Earn Program at "anytime."

160.    Plaintiffs have standing to pursue claims under the FAL because they reasonably reviewed and relied on OKCoin's statements when purchasing or exchanging UST on OKCoin and when investing UST in the Earn Program.

161.    In reliance on the statements made in OKCoin's advertising and marketing materials, and OKCoin's omissions and concealment of material facts regarding the quality and characteristics of UST, Plaintiffs and members of the Classes purchased or exchanged UST on OKCoin. Had OKCoin disclosed the true nature and characteristics of UST, Plaintiffs and members of the Classes would not have purchased UST.

162.    In further reliance on the statements made in OKCoin's advertising and marketing materials, and OKCoin's omissions and concealment of material facts regarding the quality and characteristics of the Earn Program, Plaintiff Nguyen and members of the Subclass invested UST in the Earn Program. Had OKCoin disclosed the true nature and characteristics of the Earn Program, Plaintiff Nguyen and members of the Subclass would not have invested UST in the Earn Program.

163.    As a direct and proximate result of Defendants' actions, as set forth herein, Defendants have received ill-gotten gains and profits.

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

164.    As a result, Plaintiffs, the Class Members, the Subclass Members, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendants were unjustly enriched.

165.    Pursuant to Business & Professions Code, section 17535, Plaintiff, on behalf of himself and the Class, seeks an order enjoining Defendants from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in this Complaint.

## VII.     **PRAYER FOR RELIEF**

Plaintiffs, on behalf of themselves and others similarly situated, pray for relief and judgment against Defendants as follows:

A. For an order certifying the proposed Class pursuant to Code of Civil Procedure, section 382;

B. For an order appointing Plaintiffs and their counsel to represent the Classes;

C. For an order directing Defendants to bear the costs of any notice sent to the Classes;

D. For an order enjoining Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, from conducting their business through the unlawful, unfair, and fraudulent acts or practices set forth herein;

E. For actual and compensatory damages according to proof pursuant to code and all other applicable laws and regulations;

F. Declaring that Defendants must disgorge, for the benefit of the Classes, all or part of the ill-gotten profits they received from the exchange of UST, or order Defendants to make full restitution to Plaintiff and the members of the Class except that no monetary relief is presently sought for violations of the Consumers Legal Remedies Act;

G. Declaring that Defendants must disgorge, for the benefit of the Subclass, all or part of the ill-gotten profits they received from the investment of UST in the Earn Program, or order Defendants to make full restitution to Plaintiff and the members of the Subclass except that no monetary relief is presently sought for violations of the Consumers Legal Remedies Act;

H. Awarding Plaintiffs and members of the Classes damages, as provided by the applicable state consumer protection statutes invoked above, except that no monetary relief is presently sought for violations of the Consumers Legal Remedies Act;

I. For any other restitution to the extent permitted by applicable law;

J. For punitive damages pursuant to Civil Code, section 3294(c)(3);

K. For pre-judgment and post-judgment interest;

L.  For an award of attorneys' fees, costs, and expenses as authorized by applicable law; and

M. For such other and further relief as this Court may deem just and proper.

### VIII.   DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and others similarly situated, demand a trial by jury on all issues so triable.

Dated:    September 9, 2022                       **ERICKSON KRAMER OSBORNE LLP**

Julie Erickson
Elizabeth Kramer
Kevin Osborne
*Attorneys for Michael Nguyen
and Nader George*

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

37

EXHIBIT 1

DocuSign Envelope ID: 345EB1AC-859C-4595-BF17-2E4352ECA32B

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Trenton R. Kashima (SBN 291405)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN PLLC**
401 West C St., Suite 1760
San Diego, CA 92101
Tel: (714) 651-8845
tkashima@milberg.com

Julie Erickson (SBN 293111)
Elizabeth Kramer (SBN 293129)
Kevin Osborne (SBN261367)
**ERICKSON KRAMER OSBORNE LLP**
44 Tehama Street
San Francisco, CA 94105
Tel: (415) 635-0631
elizabeth@eko.law

*Attorneys for Plaintiffs and the Class*

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

CIVIL UNLIMITED

| | |
|---|---|
| MICHAEL NGUYEN and NADER GEORGE, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>vs.<br><br>OKCOIN USA INC., and DOES 1-10<br><br>        Defendants. | Case No. 3:22-cv-03561-MMC<br><br>CLRA VENUE DECLARATION OF PLAINTIFF MICHAEL NGUYEN PURSUANT TO CALIFORNIA CIVIL CODE SECTION 1780(d) |

I, MICHAEL NGUYEN, hereby declare the following:

1.      I am a Plaintiff in the above-captioned action.

2.      I make this declaration in support of the filing of the Complaint in this action, which is based in part on violations of the Consumers Legal Remedies Act, California Civil Code, section 1750, *et seq*.

3.      The Defendant's principal address is in San Francisco, California. I confirmed this through the Defendant's statements of information, available from the California Secretary of State, on September 8, 2022.

4.      Accordingly, pursuant to California Code of Civil Procedure, section 1780, the United States District Court for the Northern District of California is the proper venue for Plaintiffs' California Consumer Legal Remedies Act claims.

        I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, that I have personal knowledge of the facts stated herein, and that I could verify the accuracy of the same if called upon to testify.  This document was executed on September 9, 2022 in San Diego, California.

DocuSigned by:

C7A8D5A7E68C4EA...

_____

MICHAEL NGUYEN

CLRA VENUE DECLARATION OF PLAINTIFF MICHAEL NGUYEN PURSUANT TO CALIFORNIA CIVIL CODE SECTION 1780(d)

EXHIBIT 2

DocuSign Envelope ID: E46EB906-B394-4A2B-9576-C30B0700C00C

1   Trenton R. Kashima (SBN 291405)          Julie Erickson (SBN 293111)
2   **MILBERG COLEMAN BRYSON**                Elizabeth Kramer (SBN 293129)
    **PHILLIPS GROSSMAN PLLC**                Kevin Osborne (SBN261367)
3   401 West C St., Suite 1760                **ERICKSON KRAMER OSBORNE LLP**
    San Diego, CA 92101                       44 Tehama Street
4   Tel: (714) 651-8845                       San Francisco, CA 94105
    tkashima@milberg.com                      Tel: (415) 635-0631
5                                             elizabeth@eko.law

6

7   *Attorneys for Plaintiffs and the Class*

8                   IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                             COUNTY OF SAN FRANCISCO

10                                 CIVIL UNLIMITED

11

12  MICHAEL NGUYEN and NADER              Case No. 3:22-cv-03561-MMC
    GEORGE, individually and on behalf of all
13  others similarly situated,            CLRA VENUE DECLARATION OF
                                          PLAINTIFF NADER GEORGE PURSUANT
14                                        TO CALIFORNIA CIVIL CODE SECTION
            Plaintiffs,                   1780(d)
15
16  vs.

17  OKCOIN USA INC., and DOES 1-10

18          Defendants.

19

20

21

22

23

24

25

26

27

28

---

CLRA VENUE DECLARATION OF PLAINTIFF NADER GEORGE PURSUANT TO CALIFORNIA CIVIL
CODE SECTION 1780(d)

DocuSign Envelope ID: E46EB906-B394-4A2B-9576-C30B8700C09C

I, NADER GEORGE, hereby declare the following:

1.      I am a Plaintiff in the above-captioned action.

2.      I make this declaration in support of the filing of the Complaint in this action, which is based in part on violations of the Consumers Legal Remedies Act, California Civil Code, section 1750, *et seq.*

3.      The Defendant's principal address is in San Francisco, California. I confirmed this through the Defendant's statements of information, available from the California Secretary of State, on September 8, 2022.

4.      Accordingly, pursuant to California Code of Civil Procedure, section 1780, the United States District Court for the Northern District of California is the proper venue for Plaintiffs' California Consumer Legal Remedies Act claims.

        I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, that I have personal knowledge of the facts stated herein, and that I could verify the accuracy of the same if called upon to testify.  This document was executed on September 9, 2022 in Carson, California.

DocuSigned by:

*Nader George*

4C91A8E4FBEC43E...

_____

NADER GEORGE

CLRA VENUE DECLARATION OF PLAINTIFF NADER GEORGE PURSUANT TO CALIFORNIA CIVIL CODE SECTION 1780(d)

1

CM-010

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>Elizabeth A. Kramer, SBN 293129<br>Erickson Kramer Osborne LLP<br>44 Tehama Street, San Francisco California, 94105<br><br>TELEPHONE NO.: 415-635-0631     FAX NO. *(Optional):*<br>ATTORNEY FOR *(Name):* Plaintiffs Michael Nguyen and Nader George | *FOR COURT USE ONLY* |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO**
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS: 400 McAllister Street
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME: Civic Center Courthouse

CASE NAME:
Nguyen et. al. v. OKCOIN USA INC., and DOES 1-10

*FOR COURT USE ONLY:*
**ELECTRONICALLY**
**F I L E D**
*Superior Court of California,*
*County of San Francisco*
**09/09/2022**
**Clerk of the Court**
BY: JEFFREY FLORES
*Deputy Clerk*

| **CIVIL CASE COVER SHEET** | **Complex Case Designation** | CASE NUMBER: **CGC-22-601712** |
|---|---|---|
| [x] **Unlimited** (Amount demanded exceeds $25,000)   [ ] **Limited** (Amount demanded is $25,000) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[x] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [x] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [x] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [x] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [x] monetary b. [x] nonmonetary; declaratory or injunctive relief c. [x] punitive
4. Number of causes of action *(specify):* Negligence, Negligent Misrepresentation, Violations of California Statutes UCL, FAL, CLRA
5. This case [x] is [ ] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: September 9, 2022

Elizabeth A. Kramer
_____
(TYPE OR PRINT NAME)           (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>*www.courts.ca.gov* |

# INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
　Asbestos Property Damage
　Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
　Medical Malpractice– Physicians & Surgeons
　Other Professional Health Care Malpractice
Other PI/PD/WD (23)
　Premises Liability (e.g., slip and fall)
　Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
　Intentional Infliction of Emotional Distress
　Negligent Infliction of Emotional Distress
　Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
　Legal Malpractice
　Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
　Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
　Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
　Negligent Breach of Contract/ Warranty
　Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
　Collection Case–Seller Plaintiff
　Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
　Auto Subrogation
　Other Coverage
Other Contract (37)
　Contractual Fraud
　Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
　Writ of Possession of Real Property
　Mortgage Foreclosure
　Quiet Title
　Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
　Writ–Administrative Mandamus
　Writ–Mandamus on Limited Court Case Matter
　Writ–Other Limited Court Case Review
Other Judicial Review (39)
　Review of Health Officer Order
　Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
　Abstract of Judgment (Out of County)
　Confession of Judgment *(non-domestic relations)*
　Sister State Judgment
　Administrative Agency Award *(not unpaid taxes)*
　Petition/Certification of Entry of Judgment on Unpaid Taxes
　Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
　Declaratory Relief Only
　Injunctive Relief Only *(non-harassment)*
　Mechanics Lien
　Other Commercial Complaint Case *(non-tort/non-complex)*
　Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
　Civil Harassment
　Workplace Violence
　Elder/Dependent Adult Abuse
　Election Contest
　Petition for Name Change
　Petition for Relief From Late Claim
　Other Civil Petition

**For your protection and privacy, please press the Clear This Form button after you have printed the form.**

Print this form | Save this form | Clear this form